IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No.:   3:23-cv-06794-JFA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| 10 PIT-BULL TYPE DOGS | ) | |
| | ) | |
| Defendants *in Rem.* | ) | |
| | ) | |
| | ) | |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE

The Plaintiff, the United States of America, brings this Complaint and alleges as follows, in accordance with Supplemental Rule G(2), Fed. R. Civ. P.

### NATURE OF THE ACTION

1.  This is a civil action *in Rem* brought to enforce 7 U.S.C. § 2156(f) for the forfeiture of 10 pit-bull type dogs ("Defendant Dogs")  that were involved in a violation of the animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156. This action also seeks the forfeiture of any offspring these seized dogs may have before entry of a final order of forfeiture.

### DEFENDANTS *in REM*

2.  The Defendant Dogs were seized at 192 Oak Creek Road, Statesville, North Carolina 28625 and 821 Bell Farm Road Statesville, North Carolina 28625 and are as follows:

    a.  Terrier Mix,USM-1278, BK, White, Male, Left eye blood shot

    b.  Terrier Mix,USM-1279, Red, Female

    c.  Terrier Mix, USM-1280, Tan, Male

    d.  Terrier Mix, USM-1281, BLK, White, Female

1

    e.  Terrier Mix, USM-1282, BLK, White, Female- Mom to puppies

    f.  Terrier Mix, USM-1283, BLK, Male

    g.  Terrier Mix, USM-1284, Brown, Male

    h.  Terrier Mix, USM-1285, Brown, Female

    i.  Terrier Mix, USM-1286, BLK/WHT, Female

    j.  Terrier Mix, USM-1287, BLK, Male, Dog and Human Aggressive, catch pole

## KNOWN POTENTIAL CLAIMANTS

3.    The persons known to the United States who may claim an interest in the Defendant Dogs are Kendrick Connor and Necola Connor as they possessed evidence in their residence suggesting ownership of the Defendant Dogs.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Upon the filing of this Complaint, Plaintiff requests that the Court issue an arrest warrant *in Rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5.    Venue is proper pursuant to 28 U.S.C. § 1355(b) because acts and omissions giving rise to the forfeiture took place in the District of South Carolina.

## STATUTORY BASIS FOR FORFEITURE

6.    The federal Animal Welfare Act, 7 U.S.C. § 2131, *et seq*., defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7

U.S.C. § 2156(a)(1). It is also illegal to sell, buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture. 7 U.S.C. § 2156(b).

7. The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(f). Animals "seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection." *Id.* In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody." *Id.*

8. The statute also contemplates forfeiture of seized live animals. Specifically,

> [a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

*Id.* The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business." *Id.*

9. As explained below, the Defendant Dogs are animals "involved in . . . violation[s]" of 7 U.S.C. § 2156 and are therefore subject to forfeiture to the United States of America pursuant to 7 U.S.C. § 2156.

## FACTUAL BASIS FOR FORFEITURE

10. Pursuant to the pleading requirements of Supplemental Rule G(2)(f), Plaintiff alleges that there is a factual basis to support a reasonable belief that the Government will be able to meet its

burden of proof at trial to show that the Defendant Dogs are subject to forfeiture to the United States, based in part upon the following:

    a. Dog fighting typically involves pit bull type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

    b. Prior to a dog fight, dog owners or handlers may enter into an agreement with their opponent, often referred to as a "match," "fight," or "show." The owners or handlers may agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact Locations of which is often a secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

    c. Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

    d. Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

    e. "Champion" or "Grand Champion" status refers to a dog who has won three or five fights, respectively.

f. It is common for successful dog fighters to sell Champions and Grand Champion dogs to other dog fighters and to breed and sell puppies from Champions and Grand Champions to other dog fighters.

g. In order to get a dog or puppy to the new owner, dog fighters will often employ the use of a fighting dog "transporter". Dog fighters will look for transporters that understand dog fighting and the need to transport these "fighting dogs" in such a manner that the dogs cannot interact. Transporters will often advertise their services in on-line forums used by dog fighters. In addition, dog fighters and breeders will share their "favorite" transporter with each other on these forms and by text messages.

h. It is common for fighting dog transporters to travel extensively from state to state picking up and delivering multiple fighting dogs to numerous locations. The customers of these transporters will sometimes represent to the transporter that a dog is being transported for a specific fight; or for a "keep," i.e., to be prepared for a specific fight; or to be bred to a specific dog from a fighting "bloodline."

i. These transporters generally do not operate as a legitimate, registered, overt business, because they are aware of the intentions of their customers, and derive their income predominantly or exclusively from those engaged in illegal activities with the dogs. Such transporters frequently charge additional fees for transporting a dog with scars or injuries, because they know they will be bearing the risk of criminal liability for possessing or transporting the dogs if they are stopped by law enforcement during the transport.

j. Dog fighters may keep multiple dogs at a time in order to maintain a stock of dogs at different weights and both sexes for dogs to be matched for a fight according to weight and sex; to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular

dog fighting bloodline; and to have a sufficient number of dogs to fight dogs more than two to three times a year.

k. Finding an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year is known as "calling out a weight." Dog fighters often "call out a weight," by telephone, text, or e-mail, to known dog fighters in several states in order to increase their odds of finding a match.

l. Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up. The dog then typically undergoes a conditioning process which dog handlers refer to as a "keep." This keep may involve treadmills to run and exercise the dogs away from public view; weight pulls to increase the dog's strength and stamina; "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs (such as steroids), vitamins, and other medicine. "Animal pelts" are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

m. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches.

n. Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

o. Although dogs used for fighting are often housed outside, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before an upcoming match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant

6

exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

      p. It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials can be found to exist in both hard and electronic copy. Dog fighters often maintain information regarding dog fighting activities in order to stay current with the dog fighting community. "Underground" dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites where dog fighters post pedigrees to demonstrate the fighting lineage of their dogs.

      q. Dog fighters today tend to communicate via email, text messages, or website chat rooms dedicated to "game dogs." Dog fighters routinely hook matches and exchange documents, tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs.

      r. On September 24, 2022, USDA-OIG and the South Carolina Law Enforcement Division (SLED) executed a federal search warrant for an active dogfight in progress in Richland County, South Carolina. Upon arriving on scene, 40-50 individuals were observed around a dogfighting pit, three individuals (two handlers and one referee) were observed inside of the pit, and two dogs were actively fighting inside of the pit. Law enforcement announced their presence,

and that they had a search warrant for the property. All of the individuals observed around or inside of the dogfighting pit fled the scene. Law enforcement was able to locate and arrest multiple individuals that fled the scene of an active dogfight in progress. One of the individuals was Kendrick Connor.

      s.    On July 18, 2023, Special Agent Dustin McPhillips ("McPhillips") with the US Department of Agriculture, Office of Inspector General (USDA-OIG) and Investigator R. B. Olson ("Olson") with the Iredell Sherriff's Office went to the residence of Kendrick Connor ("Mr. Connor") located at 196 Oak Creek Road, Statesville, North Carolina 28625 to serve him with a target letter, advise him of the legal process going forward, and to possibly interview Mr. Connor about dog fighting.

      t.    While speaking with Mr. Connor, McPhillips and Olson heard numerous dogs in the back yard consistently barking. Due to Mr. Connor's charges, McPhillips and Olson asked for consent to walk the property and Mr. Connor agreed. While walking the property, approximately 15 dogs were chained up and/or in cages. Multiple dogs had scars on their bodies and several looked to be malnourished which is indicative of dog fighting.

      t.    Animal Control Officers C. Goforth and E. Dobson responded to check the wellbeing of the dogs on the property. McPhillips, Olson, and the Animal Control Officers then asked Mr. Connor about checking the dogs and other animals inside the home. Mr. Connor became uncooperative. Mr. Connor seemed concerned about them going inside the home or the building located to the rear of the residence. Mr. Connor brought one other dog outside from the residence for Officer Goforth to check, but refused to allow her or others on the scene to check the home to ensure no other animals were in the home.

u.      Olson asked the homeowner and Mr. Connor's wife, Necola Connor, ("Mrs. Connor") for consent to search the inside of their residence. Mrs. Connor was hesitant to sign the consent form. Olson explained the consent process to Mrs. Connor and she signed the form. Mrs. Connor then continued to ask legal questions and appeared to waiver in her decision to consent to the search of the residence. Due to Mrs. Connor not being confident in signing the consent form, Olson decided to write a search warrant for the residence. Because of the observed evidence of crime of the neglected/injured animals, along with not knowing what may be inside of the residence, such as injured/deceased animals or further evidence of the investigation, Olson determined that a search warrant was necessary.

v.      The search warrant was signed by a North Carolina Magistrate Judge D. B. Chambers and executed on July 18, 2023. The following were seized from the search warrant:

(1)     Multiple record notebooks containing information on transportation and dog fighting. The notebooks documented the following information:

-A listing of "stud" dogs named Blanco 's peanut, Chinaman, Jethro, Frisco, Redboy, Jocko, Jeep, Rascal and Patrick with a contact listed for more pitbull puppies of 2526267530 and 2524741274.

-Feeding schedule and list of appropriate foods: fish, beef liver, collard greens, carrots, garlic, brown rice, com flakes, oatmeal, peanut oil, coconut oil, honey, molasses, bananas, noodles, sardines, vitamins, yogurt, cottage cheese, eggs.

-Making weight plans: pushing/pulling weights, smallest weight of dog targeting, monitoring time before taking breaths, determining stressors, running on treadmill, watching licking of lips, defecating 2x a day is KEY.

-Finding a good "head man": spring pole work during off season, tug of war and treadmill work, getting dog used to breathing while in a hold, walking with something in dog's mouth, defecating 2x a day is KEY.

(2)     4 newspaper clippings about dog fighting.

(3)     Miscellaneous receipts for transportation

9

    (4)    4 pictures in frames of prize dogs

    (5)    55 9mm live rounds of ammunition

    (6)    1 Mission First Tactical (MFT) black holster

The 2 boxes of 9mm live rounds were located in the rear right side bedroom which was a spare bedroom/common space storage room per the Connor's. The ammunition was located in an open box and both boxes of ammunition had also been previously opened. This room was neither of the Connor's younger sons. It should be noted that Mr. Connor is a convicted felon and cannot be in contact with firearms or ammunition. The MFT black holster was located near the above ammunition in the same bedroom in a bag.

    w.    While the search warrant was being executed, Animal Control Officers C. Goforth and E. Dobson determined that the dogs were not being housed on the Connor's property, but the properties owned by the surrounding neighbors, Robert Durham ("Durham") and Shenandoah Nagy ("Nagy"). Durham owns the property with the addresses of 192 Oak Creek Road, Statesville, North Carolina 28625. Nagy owns the property with the address 821 Bell Farm Road, Statesville, North Carolina 28625. Durham and Nagy signed surrender forms with Animal Control, so the animals could be retrieved by them.

    x.    Mr. Connor gave consent to allow the Animal Control Officers to check out all dogs on the outside of the property. At this point, Officer Goforth advised that there were 10 dogs on the property outside of the residence and one of the dogs, a pit bull mix, had several injuries that are consistent with dog fighting. These injuries include scaring on the legs, face, neck and chest of the dog. In total Animal Control recovered 10 dogs which were seized by the USDA-OIG per a federal seizure warrant.

y.      The following is a photograph of a dog taken while walking the properties during the search warrant.



y.      Based on the information and allegations set forth herein, there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Dogs constitute, or are traceable to animals involved in…violation[s] of 7 U.S.C. § 2156 and are therefore subject to forfeiture to the United States of America pursuant to 7 U.S.C. § 2156(f).

## **CONCLUSION**

By reason of these premises, and pursuant to 7 U.S.C. § 2156, whereby the Plaintiff's right, title and interest in and to the Defendant Property relates back to the commission of the act giving rise to the forfeiture, the Defendant Property have become and are forfeited to the United States of America, to be disposed of pursuant to Supplemental Rule G(7)(c) for Admiralty or Maritime Claims and Asset Forfeiture Actions, 7 U.S.C. § 2156(f) and other applicable laws.

WHEREFORE, Plaintiff prays that due process issue to enforce the forfeiture of the Defendant Dogs, in rem; that a Warrant for the Arrest of the Defendant Property be issued; that due Notice be given to all interested persons to appear, make claim, answer and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* be forfeited to the United States of America for disposition according to law; that the Court enter a judgment for costs associated with the care of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(f) should any interested party file a claim for the Defendants *in rem*; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: *s/Carrie Fisher Sherard*
Carrie Fisher Sherard #10134
Assistant United States Attorney
55 Beattie Place, Suite 700
Greenville, SC 29601
(864) 282-2100
*Attorney for the Plaintiff*

December 19, 2023